**In re GLADE SPRINGS, INC., Debtor.**

**Bankruptcy No. 3–83–01854.**

United States Bankruptcy Court,
E.D. Tennessee.

Aug. 7, 1987.

Jenkins & Jenkins, Michael H. Fitzpatrick, Knoxville, Tenn., for debtor.

Cadwalader, Wickersham & Taft, Mark C. Ellenberg, Antoinette C. Emery, Washington, D.C., Walker & Walker, P.C., John A. Walker, Jr., Knoxville, Tenn., for D. Broward Craig, trustee.

Morton, Lewis, King & Krieg, Mary M. Farmer, Joseph G. Murray, Knoxville, Tenn., for Federal Deposit Ins. Corp.

Hunton & Williams, John A. Lucas, Knoxville, Tenn., for United Virginia Bank.

Walt, Dyer & James, Robert E. Craddock, Memphis, Tenn., for Federal Sav. and Loan Ins. Corp.

Frantz, McConnell & Seymour, Robert M. Bailey, Knoxville, Tenn., for Thomas E. DuVoisin, liquidating trustee.

Marilyn L. Hudson, Asst. U.S. Atty., Knoxville, Tenn., for I.R.S.

RICHARD STAIR, Jr., Bankruptcy Judge.

This court is called upon to determine whether the "Amended Plan Of Reorganization Proposed By Glade Springs, Inc., Debtor In Possession," filed on September 10, 1986, meets the confirmation requirements of 11 U.S.C.A. § 1129 (West 1979).[1]

I

Glade Springs, Inc. (debtor) is a Delaware corporation whose principal asset was a large resort complex situated near Beckley, West Virginia. The complex, a combination land development and resort contained within approximately 3,850 acres, was divided into three phases: Phase I consisting of 670 acres, more or less, developed with approximately 250 single family lots, 117 condominiums, and recreation facilities including a golf club and course, swim club, tennis courts, equestrian center, Inn and executive suites; Phase II consisting of 1,800 acres, more or less, of unimproved land; and Phase III consisting of either 1,400 or 1,500 acres, more or less, of unimproved land. In addition, Glade Springs Utility Company, a utility district, privately owned and operated by the debtor, services the Phase I development. The debtor also owned certain personal property which was utilized in the operation of the Glade Springs resort.

The debtor is a wholly-owned subsidiary of West Knoxville Investment Company, Inc., an alter ego of David A. Crabtree, a debtor under Chapter 7 whose case is pending in this court.[2] The original trustee of the Crabtree estate, Francis Norwood, as the owner and holder of all of the outstanding shares of the common stock of Glade Springs, Inc., caused the debtor's Chapter 11 petition to be filed on November 30, 1983. D. Broward Craig (Craig) succeeded Norwood as trustee of the Crabtree estate on April 6, 1984.

At the time of the filing of the Chapter 11 petition, all phases of the Glade Springs resort complex were mortgaged in excess of their values. Several lenders held mortgages on various portions of the debtor's real estate, while others held mortgages on the entire project. Glade Springs had no operating funds. As testified to by Craig, who became chief executive officer and president of the debtor, there was initially only $500.00 in operating funds. (The debtor's schedules reflect a $14,000.00 overdraft of its bank account.) Interim financing was arranged in order to provide funds essential to the continued operation of the resort for the benefit of property owners and in an effort to maximize the sale value

---

1. Since the case was commenced on November 30, 1983, the court must consider this matter in light of § 1129 of the Bankruptcy Code as enacted by the Bankruptcy Reform Act of 1978 and prior to enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333, 386 (1984).

2. Case No. 3–83–01116, David A. Crabtree, a/k/a West Knoxville Investment Company, Inc.

of the complex. Upon approval of this court the debtor borrowed $150,000.00 from Raleigh National Bank; $75,000.00 from Beckley National Bank; and $75,000.00 from the David A. Crabtree estate.

Shortly after his appointment as successor trustee, Craig, in his capacity as chief executive officer and president of Glade Springs, continued the efforts of his predecessor to negotiate a sale of the resort complex. A comprehensive brochure was prepared for prospective purchasers setting forth the location and development history of the resort, its various facilities, tables, maps, photographs and drawings.

After a marketing campaign through which many prospective purchasers were contacted, a sale of the complex free and clear of liens with the liens attaching to the proceeds was consummated in September, 1984, upon court approval for the sum of $5,600,000.00. This sum exceeded by $1,600,000.00 an earlier offer made in March, 1984, which had been rejected. The sale proceeds, less certain administrative expenses and taxes, have been invested by Craig pending distribution.

On motion by the debtor, the court fixed September 30, 1985, as the bar date for filing claims. The debtor, based upon the claims filed, evaluated the secured claims as to amount, validity, and priority. Objections were filed to the claims of the Crabtree estate, the Federal Savings and Loan Insurance Corporation (FSLIC), and Chemical Bank. Also, an adversary proceeding (Adv. No. 3–85–1278) was commenced seeking to invalidate a deed of trust against the Inn in favor of Tennesco, Inc. (The Federal Deposit Insurance Corporation (FDIC) and FSLIC contend they are the real parties in interest with respect to the Tennesco lien.)

The objection to the Chemical Bank claim was overruled by this court. *In re Glade Springs, Inc.*, 47 B.R. 780 (Bankr.E.D. Tenn.1985). However, on appeal to the United States District Court for the Eastern District of Tennessee the claim was disallowed. *In re Glade Springs, Inc.*, Civ. 3–85–466 (E.D.Tenn. Jan. 23, 1986). The matter is now on appeal to the United States Court of Appeals for the Sixth Circuit. The Tennesco adversary proceeding resulted in a default judgment invalidating the Tennesco mortgage. The other pending objections and adversary proceedings, with the exception of certain objections, motions and an adversary proceeding (Adv. Proc. No. 3–86–0200) filed by the FDIC shortly before the November 3, 1986 confirmation hearing, have been resolved through negotiations. The negotiated agreements are incorporated into the debtor's plan of reorganization.

Prior to the sale of the Glade Springs resort complex, the FDIC, a partially secured creditor, commissioned an appraisal of the debtor's real estate. This appraisal, through a valuation of the three phases of the resort complex and its recreation facilities,[3] establishes a fair market value for the entire project at $5,825,000.00 as of June 15, 1984. The component breakdown of this appraisal is as follows:

| | | |
|---|---|---|
| Phase I and Utility System— (Excluding Operating Properties) | | $1,125,000 |
| Phase II— | | 1,440,000 |
| Phase III— | | 560,000 |
| Recreation Facilities— Divided as follows: | | 1,700,000 |
| Golf Club and Course— | $1,450,000 | |
| Swim Club— | 75,000 | |
| Tennis Complex— | 125,000 | |
| Equestrian Center— | 50,000 | |
| Inn | | 300,000 |
| Executive Suites | | 700,000 |
| Total Value Glade Springs | | $5,825,000 |

The debtor employed Alfred A. Robinson Co. to appraise the personal property owned by the estate. These assets were appraised at $271,317.50. Thus, the combined appraisal of both the real and personal property owned by the debtor amounts to $6,096,317.50.

## II

On August 25, 1986, the debtor filed its "Amended Disclosure Statement." On

---

**3.** "Operating Properties" and "Recreation Facilities" as used in the appraisal and in this Memo-

randum denote the same facilities.

September 9, 1986, an order was entered which: approved the debtor's disclosure statement, as amended; required the debtor within seven days to forward to all creditors, equity security holders, and other parties in interest, a copy of the order approving the disclosure statement, as amended; required the debtor to forward to all creditors a ballot through which the plan as proposed by the debtor could be accepted or rejected; fixed October 27, 1986, as the last day for filing written acceptances or rejections to the plan and as the last day for filing written objections to confirmation; and fixed November 3, 1986, as the day for the hearing on confirmation.

The debtor's amended plan recognizes thirteen classes of creditors and proposes to distribute available funds. At the time of the filing of the amended plan, there remained available for distribution after tax allocations and other deductions the sum of $5,591,450.69. Including interest on investments, the estate funds exceeded $6,000,000.00 as of the November 3, 1986 hearing on confirmation.

The debtor, in order to allocate the sale proceeds among the three phases of the resort and its operating properties, determined the ratio of the actual net sales price of the property as sold, less certain expenses but including interest as of March 24, 1986, i.e., $5,815,553.91, to the appraised value, i.e., $6,096,317.50. This ratio is 95.3945379 percent. Thus, the debtor in its plan allocates the sale proceeds to each portion of the resort as follows:

| | PARCEL | APPRAISED VALUE | FACTOR | | | *DOLLAR VALUE |
|---|---|---|---|---|---|---|
| 1. | Phase I | $1,375,000.00 [4] | × .953945379 | = | | $1,311,674.90 |
| 2. | Phase II | 1,440,000.00 | × .953945379 | = | | 1,373,681.35 |
| 3. | Phase III | 560,000.00 | × .953945379 | = | | 534,209.41 |
| 4. | Golf course and club | 1,450,000.00 | × :953945379 | = | | 1,383,220.80 |
| 5. | Inn | 300,000.00 | × .953945379 | = | | 286,183.61 |
| 6. | Executive suites and personalty | 754,080.00 | × .953945379 | = | | 719,351.13 |
| 7. | CJ5 vehicle | 2,000.00 | × .953945379 | = | | 1,907.89 |
| 8. | Van vehicle | 2,000.00 | × .953945379 | = | | 1,907.89 |
| 9. | Unencumbered personalty | 213,237.50 | × .953945379 | = | | 203,416.93 |

* The "Dollar Value" figures are based on the debtor's calculations

---

From the dollar values determined in accordance with the above formula, the debtor, in order to arrive at the net amount available for distribution, has deducted from the "Dollar Value" column real property taxes previously paid by authority of the court. The debtor's original distribution figure of $5,591,450.69 is arrived at through the following calculations:

| | PARCEL | DOLLAR VALUE | TAX ALLOCATION | NET AVAILABLE FOR DISTRIBUTION |
|---|---|---|---|---|
| 1. | Phase I | $1,311,674.90 | $ 57,682.12 | $1,253,992.78 |
| 2. | Phase II | 1,373,681.35 | 2,924.35 | 1,370,757.00 |
| 3. | Phase III | 534,209.41 | 1,380.04 | 532,829.37 |

---

**4.** The appraisal value of Phase I is $1,125,000.00. However, the debtor, in its plan, for valuation purposes has included the swim club ($75,000.00), tennis complex ($125,000.00), and equestrian center ($50,000.00) as a part of Phase I.

| | | TAX | NET AVAILABLE |
| PARCEL | DOLLAR VALUE | ALLOCATION | FOR DISTRIBUTION |
|---|---|---|---|
| 4. Golf course and club | $1,383,220.80 | $ 33,525.50 | $1,349,695.30 |
| 5. Inn | 286,183.61 | 21,284.70 | 264,898.91 |
| 6. Executive suites and personalty | 719,351.13 | 49,664.32 | 669,686.81 |
| 7. Unencumbered personalty | 203,416.93 | 57,642.19 | 145,774.74 |
| 8. CJ5 Vehicle | 1,907.89 | 0 | 1,907.89 |
| 9. Van Vehicle | 1,907.89 | 0 | 1,907.89 |
| Total | $5,815,553.91 | $224,103.22 | $5,591,450.69 |

The debtor states in its plan that it is "the intent of the Plan, first, to allocate the principal and interest thereon to the various portions of the property pursuant to an FDIC–commissioned appraisal and pursuant to the personal property appraisal made by Alfred A. Robinson, and thereafter to allocate those relative sale proceeds by parcel to the secured interests therein based on priority of claim[s]." The debtor proposes to deduct certain expenses, which it believes it may recover under the provisions of 11 U.S.C.A. § 506(c) (West 1979), prior to distribution to the holders of secured claims.[5] The expenses which are to be deducted from the sale proceeds prior to allocation as enumerated in the plan total $640,171.16 and are itemized as follows:

| Payee | Amount | Consideration |
|---|---|---|
| Alfred A. Robinson Co. | $ 3,104.00 * | Appraisal services |
| FDIC | 31,583.00 | Reimbursement for appraisal expense |
| Raleigh County Nat'l Bank | 183,106.07 * | Repayment of $150,000 loan with interest |
| Beckley Nat'l Bank | 90,908.79 * | Repayment of $75,000 loan with interest |
| David A. Crabtree bankruptcy estate | 90,442.85 * | Repayment of $75,000 post-petition operating loan with interest |
| D. Broward Craig | 50,000.00 | Efforts as chief executive officer of the debtor to preserve the estate for the benefit of creditors and in negotiating sale of assets |
| David A. Crabtree bankruptcy estate | 181,026.45 | Reimbursement of legal expenses for services of Cadwalader, Wickersham & Taft in connection with sale of Glade Springs resort |
| David A. Crabtree bankruptcy estate | 10,000.00 | Reimbursement of legal expenses for services of Walker & Walker, P.C. for preparation of debtor's |

5. *§ 506. Determination of secured status.*

. . . . .

(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

| Payee | Amount | Consideration |
|---|---|---|
| | | voluntary Chapter 11 petition and as local counsel in connection with the sale of debtor's assets |

* Expense previously paid in full.

The plan proposes the following payments to creditors asserting secured claims:

| Claimant | Amount of Claim | Proposed Payment | Source of Proceeds for Payment |
|---|---|---|---|
| Crabtree Estate | $5,618,392.90 | $1,228,992.78 | Phase I |
| | | 1,370,757.00 | Phase II |
| | | 22,650.22 | Golf course and club |
| | | $2,622,400.00 | |
| FDIC | 12,134,828.11 | 669,686.81 | Executive suites |
| | 1,711,522.27 | 1,327,045.08 * | Golf course and club |
| | | 264,898.91 ** | Inn |
| | $13,852,350.38 | $2,261,630.80 | |
| DuVoisin, Liquidating Trustee for SIBC | 170,988.98 | 25,000.00 | Phase I |
| United Virginia Bank | 816,253.42 | 532,829.37 | Phase III |
| Chemical Bank | 558,587.73 | 558,587.73 *** | Golf course and club |
| FSLIC | 530,116.47 | 132,449.45 | Inn |
| IRS | 82,286.80 **** | 52,157.79 | Proceeds from personalty |
| First Nat'l Bank of Bluefield | 2,173.49 | 1,907.89 | Motor Vehicle |
| | 4,971.05 | 1,907.89 | Motor Vehicle |
| | $ 7,144.54 | $ 3,815.78 | |

* Payment is subject to a $558,587.73 reduction if the Chemical Bank claim is allowed as a secured claim.

** Payment is subject to a $132,449.45 reduction if FSLIC elects to accept the plan. (FSLIC has voted to accept the plan.)

*** The status of this claim is the subject of an appeal to the Sixth Circuit Court of Appeals. If the claim is unsecured Chemical Bank will not receive any payment.

**** Only a portion of this claim, approximately $52,000.00, is secured.

Prior to the November 3, 1986 hearing on confirmation, written objections to confirmation were filed by four creditors: Thomas E. DuVoisin, Liquidating Trustee of the Creditors' Liquidating Trust pursuant to the Modified Plan of Reorganization of Southern Industrial Banking Corporation (SIBC); the FDIC; United Virginia Bank (UVB); and the Internal Revenue Service (objecting creditors).[6] Each of these objecting creditors together with Chemical Bank[7] also returned their ballots to the debtor showing rejection of the plan.

6. The Internal Revenue Service filed its objection to confirmation on October 29, 1986, two days beyond the bar date fixed by the court in its September 9, 1986 order. Upon motion of the Internal Revenue Service that it be permitted to file this late filed objection and with the consent of the debtor, the filing of this objection has been allowed.

7. While Chemical Bank, through its attorneys, entered an appearance at the November 3, 1986 hearing on confirmation, that creditor did not participate in the hearing which extended over a two-day period.

## III

The objecting creditors ground their objections to confirmation on the following allegations: [8]

(1) The proposed plan does not comply with the applicable provisions of Chapter 11;

(2) The plan has not been proposed in good faith;

(3) The plan proposes to make payments for services, costs and expenses which have not been approved by the bankruptcy court or which are not subject to approval by the bankruptcy court;

(4) The plan proposes to improperly allocate and pay prior to distribution to secured creditors the following administrative expense claims pursuant to the provisions of Bankruptcy Code § 506(c): $50,000 to D. Broward Craig; $181,026.45 to the law firm of Cadwalader, Wickersham & Taft; and the sum of $10,000 to the law firm of Walker and Walker, P.C.;

(5) The plan is not in the best interest of creditors;

(6) An impaired class of creditors has rejected the plan; and the plan discriminates unfairly, and is not fair and equitable, with respect to each class of claims that is impaired under the plan and does not provide for payment of the allowed secured claims of all secured creditors.

The debtor's plan can be confirmed only if the court determines that all the requirements of Bankruptcy Code § 1129 have been met. The salient provisions of § 1129 which are at issue are as follows:

### § 1129.  Confirmation of plan.

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this chapter.

.    .    .    .    .

(3) The plan has been proposed in good faith and not by any means forbidden by law.

(4)(A) Any payment made or promised by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the plan and incident to the case, has been disclosed to the court; and

(B)(i) any such payment made before confirmation of the plan is reasonable; or

(ii) if such payment is to be fixed after confirmation of the plan, such payment is subject to the approval of the court as reasonable.

.    .    .    .    .

(7) With respect to each class—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

.    .    .    .    .

(8) With respect to each class—

(A) such class has accepted the plan; or

(B) such class is not impaired under the plan.

.    .    .    .    .

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with

---

**8.** Not all grounds are asserted by each creditor. This itemization constitutes a summary of the general objections raised by the objecting creditors. Additionally, DuVoisin specifically objects to the plan's proposed payment of the $31,- 583.00 FDIC appraisal expense while no payment is proposed for the $4,241.16 expense he incurred for an appraisal of the Glade Springs Utility Company stock. Further, the FDIC also has additional objections.

respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the lien securing such claims, whether the property subject to such lien is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the lien securing such claims, free and clear of such lien, with such lien to attach to the proceeds of such sale, and the treatment of such lien on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

. . . . .

11 U.S.C.A. § 1129 (West 1979).

### Value of the Glade Springs Utility Co. Stock

■ The Glade Springs Utility Co. stock secures a $170,988.98 debt held by Thomas E. DuVoisin, SIBC Liquidating Trustee. Contending the fair market value of the stock is only $25,000.00, the debtor proposes to satisfy the secured portion of the claim by paying $25,000.00 from the proceeds attributable to Phase I. DuVoisin contends the value of the stock exceeds the amount of the claim and that the claim is thus fully secured. Hence, DuVoisin asserts the court need not reach the "cram down" question because the plan fails to satisfy § 1129(a)(7). The debtor's attorney concedes the proposed plan may not be confirmed if the value of the utility company stock exceeds $25,000.00.

Richard O. Martin, a real estate appraiser, participated in the appraisal commissioned by FDIC. The FDIC appraisal does not reflect a separate value for the utility company assets. According to Martin, the value of the Phase I lots is enhanced by the utilities. Indeed, Martin does not believe the lots could be sold without the utility improvements. However, Martin testified the utility system probably has over $20,000.00 in deferred maintenance and that it would not be profitable to a third-party investor in any reasonable time frame. Martin estimated "off-the-cuff" that an investor who is willing to gamble might pay $20,000.00 to $30,000.00 for the utility company stock, but he does not believe the stock has any market value. Martin has never appraised the stock of an entity such as Glade Springs Utility Co.

Because the FDIC appraisal does not separately value the utility company, DuVoisin commissioned Jay Goldman to appraise the utility. Goldman, a real estate broker, consultant and appraiser, has appraised and sold commercial property in the area where the Glade Springs resort is located. He has also appeared in condemnation cases as an expert witness for several utility companies. Based on a cost approach, Goldman estimates the value of the utility company at $565,000.00, as of September 23, 1986. He does not believe there is any significant difference in value between the date of his appraisal (September 23, 1986) and the date of the FDIC appraisal (June 15, 1984). Goldman chose a cost approach over an income approach to valuation because many lots in Phase I have not been sold, and the lots could not be sold without the existing facilities.

The brochure prepared to promote the sale of the Glade Springs resort reflects reported investment of approximately $1,562,000.00 in Glade Springs Utility Co. through March 31, 1984. A twelve (12) percent profit is projected.

The proof simply does not favor a finding that the value of the utility company stock is only $25,000.00. The utility company's assets irrefutably enhance the value of Phase I. The per acre value of Phase I, which includes utilities, is approximately $1,680.00, whereas the per acre value of Phase II, without utility improvements, approximates $800.00. The court must give considerable credence to the testimony of Goldman as he, unlike Martin, has considerable experience in valuing utility company assets.

Since DuVoisin has not accepted the plan and the debtor has not established that the plan satisfies the best interest of creditors test with respect to the claim held by DuVoisin, the debtor's amended plan of reorganization cannot be confirmed. The plan must be further amended to increase the payment to DuVoisin. However, other problems also preclude confirmation.

### Tennesco, Inc. Deed of Trust

The debtor scheduled Tennesco, Inc. as a secured creditor with a $4,000,000.00 claim secured by a mortgage against the Inn property. The debtor scheduled the Tennesco claim as "disputed."

FDIC and FSLIC, successors to holders of participation interests in a $4,000,000.00 note to Tennesco, Inc. purportedly secured by a deed of trust against the Inn, both assert an interest in the $264,898.91 in net proceeds attributable to the Inn. According to the debtor's disclosure statement, the lien of the FSLIC, if valid, is junior to a lien asserted by the Crabtree estate, but superior to the claim of FDIC. The plan proposes to split the $264,898.91 in proceeds attributable to the Inn between FDIC and FSLIC.

On December 14, 1984, FSLIC filed claim no. 68 as a secured claim in the amount of $530,116.47. The debtor objected to the claim; a hearing was scheduled then stricken, to be reset on motion of either the debtor or FSLIC. Thereafter, Craig, as trustee of the Crabtree estate, also filed an objection to claim no. 68. Twelve days later, on November 25, 1985, the debtor filed a complaint (Adv. Proc. No. 3–85–1278) against Tennesco, Inc. seeking to avoid the Tennesco deed of trust as a cloud on the debtor's property. The debtor did not, however, name FSLIC as a defendant in the Tennesco proceeding despite Craig's awareness of the FSLIC claim. On the motion of the debtor, a default judgment against Tennesco was entered January 2, 1986. The judgment recites in part:

That the Deed of Trust of June 19, 1981, for the beneficial interest of Tennesco, Inc. found in Book 473 at Page 452, et seq. in the Register of Deed's Office for Raleigh County, West Virginia granted by Glade Springs, Inc. is void and of no effect....

Seven days later, on January 9, 1986, the FSLIC filed a motion to intervene and set aside the default judgment. Several months later, on October 27, 1986, the FDIC likewise filed a motion to intervene and set aside the default judgment. Both motions to intervene are still pending.

The plan proposes to settle all issues in Adv. Proc. No. 3–85–1278. While the FSLIC accepts the proposal, the FDIC objects. FDIC insists that a Chapter 11 liquidating plan may not be used to dispose of adversary proceedings involving disputes as to the extent, priority and validity of liens where such disposition is nonconsensual. Further, FDIC contends that the court cannot determine whether the best interest of creditors test, § 1129(a)(7), is met until there is a judicial resolution of the lien disputes.

Although the court is not prepared to hold that no adversary proceeding may be disposed of through a Chapter 11 plan where a party to a related adversary proceeding objects, the court does agree that with respect to the FDIC and FSLIC claims it cannot determine whether the § 1129(a)(7) test is satisfied. The debtor's proposal substitutes an involuntary settlement for certainty. The present record

does not favor approval of such involuntary settlement.[9] Absent compromise, the disputes involving the Tennesco deed of trust must be judicially resolved.[10]

### Crabtree Estate Claims

■ As trustee of the Crabtree estate, Craig asserts the following claims:

| Claim No. | Amount | Consideration |
|---|---|---|
| 96 | $ 75,000.00 plus interest | Operating loan |
| 97 | 181,026.45 | Legal services of Cadwalader, Wickersham & Taft |
| 98 | 5,618,392.90 | Loans |
| * | 10,000.00 | Legal services of Walker & Walker, P.C. |

\* No proof of claim was filed by the Crabtree estate for reimbursement for these services. Proof of this claim was elicited through testimony of John A. Walker, Jr., a principal in the Walker & Walker firm.

Claim No. 98, a secured claim, is based on five subordinated debentures plus loans made to the debtor by West Knoxville Investment Co., Inc., David Crabtree's alter ego, pursuant to a future advance clause of a deed of trust encumbering the entire resort property. Prior to proposal of the debtor's plan, the debtor and FSLIC commenced separate adversary proceedings seeking a determination of the extent and validity of the Crabtree estate's secured claim.[11] Additionally, as an alternative to denial of the claim, FSLIC requested subordination of claim no. 98 to the claims of all other creditors of Glade Springs. On October 27, 1986, only one week prior to the confirmation hearing, FDIC filed a complaint also seeking a determination of the extent, priority and validity of the lien Craig asserts. (See. Adv. Proc. No. 3–86–0200.) FDIC seeks denial of claim no. 98; alternatively FDIC also requests subordination of "the claims of D. Broward Craig as Trustee for the Estate of David A. Crabtree...."

The plan proposes to pay $2,622,400.00, the asserted amount of future advances by West Knoxville Investment Co., Inc. to the debtor, from the sale proceeds against claim no. 98. The balance of the claim will be treated as unsecured. Craig, as president of the debtor, and FSLIC do not object to this proposed treatment of claim no. 98. The FDIC, however, does object because Craig, as president of the debtor, has made a unilateral determination of Craig's own lien rights as trustee of the Crabtree estate. FDIC insists that Craig's lien rights must be determined through an adversary proceeding.

Assuming arguendo that FDIC is incorrect and that the court may determine Craig's disputed lien rights in the context of a Chapter 11 plan confirmation, the court nonetheless cannot find that claim no. 98 is a secured claim in the amount of $2,622,400.00. Some of the photocopy attachments to claim no. 98, cancelled checks and deposit slips purportedly representing the advances to the debtor from West Knoxville Investment Co., Inc., are illegible. Further, Craig's testimony about these checks is quite limited. The debtor's unaudited general ledger, which is of doubtful accuracy, reflects three notes pay-

---

**9.** A serious question of proper service exists in *Glade Springs v. Tennesco, Inc.,* Adv.Proc. No. 3–85–1278.

**10.** On August 21, 1986, nearly eleven months after the bar date, FDIC filed claim no. 111 in the amount of $1,761,697.54, reportedly secured by the Tennesco deed of trust. On November 5, 1986, the court entered an order reciting that claim no. 111 was not timely filed but expressly stating that the court was not deciding the validity of the FDIC lien. The court disagrees with Craig's position that the disallowance of claim no. 111 voids any lien of the FDIC against the Inn proceeds. See *Matter of Tarnow,* 749 F.2d 464 (7th Cir.1984) (disallowance of claim on basis of untimeliness did not, pursuant to § 506(d), invalidate Commodity Credit Corporation lien).

**11.** See *Glade Springs v. Craig,* Adv.Proc. No. 3–85–1262 and *FSLIC v. Craig,* Adv.Proc. No. 3–85–1279. Other creditors asserting interests in the resort property are not defendants in either of these adversary proceedings. It appears to the court that a meaningful determination of the extent and validity of interests in the resort property could only be obtained through a joinder of all claimants asserting interests in the property. The debtor commenced such a proceeding on May 22, 1984. See *Glade Springs v. Craig,* Adv.Proc. No. 3–84–0189. (FSLIC, however, is not a party to Adv.Proc. No. 3–84–0189, which is still pending.)

able to "WKI," "West Knoxville," and "West Knox." totaling $1,518,266.69, as of December 31, 1983. The present record simply does not establish that David Crabtree a/k/a West Knoxville Investment Co., Inc. advanced $2,622,400.00 to the debtor pursuant to a future advance clause in a deed of trust without any repayment.

FDIC and UVB also object to the proposed reimbursement of the Crabtree estate for legal expenses (associated with Glade Springs) billed by Cadwalader, Wickersham & Taft and Walker & Walker, two law firms representing Craig as trustee in the Crabtree case.[12] The appropriateness and reasonableness of the requested reimbursement is challenged.

Claim no. 97 is filed as an administrative claim in the amount of $181,026.45 for "services rendered [by Cadwalader, Wickersham & Taft] to the Debtor's estate to preserve and protect its assets and to assist in [the] sale of assets." As has been noted, no claim is filed by the Crabtree estate relative to fees charged by Walker & Walker. According to John Walker's testimony at the confirmation hearing, a determination was made that it would not be proper for his firm to serve as counsel for Glade Springs; his firm's services benefiting the Glade Springs estate include, primarily, consulting with Cadwalader attorneys, drafting the voluntary Chapter 11 petition, seeing that schedules were prepared, and successfully opposing the involuntary petition against Glade Springs filed in West Virginia; the total value of these services is $17,635.00. It is not clear why the Crabtree estate seeks reimbursement as an administrative expense of only $10,000.00 of the amount billed by Walker & Walker for services connected with Glade Springs.[13]

Craig insists his attorneys have made a substantial contribution fostering and enhancing the process of reorganization and that payment by the Glade Springs estate is in order pursuant to Bankruptcy Code § 503(b)(3) and (4), which provides in part:

*§ 503. Allowance of administrative expenses*

• • • • •

(b) After notice and a hearing, there shall be allowed, administrative expenses ... including—

• • • •

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection incurred by—

• • • •

(D) a creditor ... in making a substantial contribution in a case under chapter ... 11 of this title;

• • • •

(4) reasonable compensation for professional services rendered by an attorney ... of an entity whose expense is allowable under paragraph (3) of this subsection ... and reimbursement for actual, necessary expenses incurred by such attorney ...

• • • •

11 U.S.C.A. § 503 (West 1979).

The problem with Craig's request for reimbursement is illustrated by the following entry describing Murray Drabkin's services in the narrative attached to claim no. 97:

| Date | Description of Service | Time | Value |
|---|---|---|---|
| 11/30/83 | Call from Walker re filing of Glade Springs Chapter 11 and conference with MCE and BJD re interrelationship between Tennessee and W. Virginia proceedings; call to Judge Pearson's law clerk re proceedings in W. Va.; preparation for and conference call with Judge Pearson's law clerk re proceedings in W. Virginia; preparation for and conference call with Judge Pearson re motion by petitioning creditors for appointment of an interim trustee in W. Virginia; development of strategy to preserve Crabtree assets. [Emphasis added.] | 08.84 | $1,944.80 |

---

12. The two law firms have previously received interim compensation for their services from the Crabtree estate.

13. The record does not include an extract of services related to Glade Springs from the interim fee applications of Walker & Walker filed in the Crabtree case. Such an extract is essential for this court to determine whether the Crabtree estate should be reimbursed for any portion of the $10,000.00 requested.

Many of the services performed by Craig's attorneys resulted in an apparently mutual benefit to the Crabtree and Glade Springs estates. It is questionable whether the Glade Springs estate should reimburse the Crabtree estate in such instances. See *Matter of Multiponics, Inc.*, 622 F.2d 731, 734 (5th Cir.1980) (services beneficial to the estate rendered by counsel for indenture trustee in bankruptcy reorganization are compensable from estate funds except where services primarily benefited the debenture holders).

It is also questionable whether the Glade Springs estate should reimburse the Crabtree estate at the rates charged by Craig's attorneys. Although this court has previously approved those rates in the Crabtree case, the Glade Springs case is not nearly as demanding or complex. Further, the debtor's attorney, Michael Fitzpatrick, has agreed to serve as counsel for Glade Springs based on an hourly rate significantly lower than the customary rates of Craig's attorneys.[14]

In a memorandum filed December 18, 1986, UVB appears to object to claimed administrative expenses such as the $75,000.00 operating loan (claim no. 96) previously repaid by the debtor to the Crabtree estate. UVB asserts the operating loans may have benefited other secured creditors but they were neither necessary to preserve nor beneficial to UVB's collateral. The court disagrees. The sale of the resort as a whole, and as an on-going business, appears to have enhanced the value of the Phase III acreage. The $400.00 per acre UVB stands to receive significantly exceeds the $275.00 per acre paid for another

large tract in the general area of the Glade Springs resort. Foreclosure would have brought a lesser amount in an area where there is little or no market for tracts similar to Phase III.

### Craig's $50,000.00 Claim

■ On September 27, 1985, Craig filed an administrative claim (claim no. 102) on his own behalf in the amount of $50,000.00. The proof of claim recites the consideration for the claim is:

> fees owing to President of the Debtor for operating and managing Debtor and its principal asset (a resort/hotel complex), for marketing and selling the property for $5,600,000 and taking actions to collect assets owing to Debtor. This fee also includes all work to the date hereof as President of Glade Springs subsequent to the sale, including matters relating to the determination of allowable claims. Work performed subsequent hereto may require submission of a claim or claims for supplemental fees.

Craig estimates he spent 634 hours on Glade Springs matters between February 27, 1984, (a date five weeks prior to his appointment as successor trustee in the Crabtree case) and November 3, 1986. He did not keep contemporaneous, precise time records.

DuVoisin, FDIC, and UVB all object to payment of the claim. The objectors collectively contend Craig owes the Crabtree estate a fiduciary duty and he will be compensated for his efforts pursuant to § 326 from the Crabtree estate monies; that Craig was not, and could not be approved by the court as a broker to market the resort; that the sale agreement prohibits

---

14. On March 18, 1987, the court entered an order (order no. 260) in the Crabtree case authorizing Craig to pay Glade Springs up to $35,000.00 of the $181,026.45 he seeks in reimbursement pursuant to claim no. 97 to cover an anticipated shortfall in funds needed to pay the administrative and priority claims in accordance with the Glade Springs liquidating plan.

The order recites in part: "Said payment is authorized only if Glade Springs has exhausted its funds available to pay administrative and priority claims, and if the Crabtree estate's administrative claim for approximately $181,000 is allowed in full and paid under 11 U.S.C. § 506(c) from the secured proceeds of sale."

any claim for a broker's fee; that the amount of the claim is unreasonable; and that there is inadequate proof of the time expended.

Craig has not received any compensation as president of the debtor. He obtained a cash sale price for the resort of $5,600,-000.00, an amount $1,600,000.00 greater than an offer made before he assumed his duties as trustee of the Crabtree estate. A broker might have requested a fee of $150,-000.00. Of course, any such fee request would have been subject to court approval.

The point is that Craig's efforts have unquestionably benefited the debtor's estate. It would be inequitable and unfair to deny him any compensation from the debtor's estate. The amount, however, remains to be determined.

### § 506(c) Expenses

■ As previously noted, the debtor contends $640,171.16 in expenses are within the scope of § 506(c).[15] The debtor proposes to deduct these expenses from the sale proceeds prior to distribution to the holders of secured claims. Contending the proposal effectively taxes these § 506(c) expenses against only junior lienholders instead of against all secured creditors to the extent of benefit, the FDIC asserts the proposal unfairly discriminates against it and other creditors, to the advantage of the Crabtree estate.

The debtor has not established the basis for treating the § 506(c) expenses differently than the property taxes which are to be allocated against the security property. Where the benefit to a competing secured creditor from an expense necessarily incurred by a debtor in possession to pre-

serve or dispose of the security property is direct, not incidental, it is equitable to prorate the expense among the secured creditor beneficiaries.

### IRS Objections

■ The IRS has filed a proof of claim in the amount of $82,286.80. This claim is partially secured. Prior to the confirmation hearing IRS filed an objection asserting there is no provision to pay its $52,-157.79 secured claim. At the confirmation hearing, however, the attorney for IRS announced that she and the debtor's attorney had reconciled the disposition of more than $145,000.00 in sale proceeds partially encumbered only by the IRS tax lien. However, the IRS contends there are no funds to pay its priority claim in the amount of approximately $30,000.00 and other designated priority claims, which, absent consent by the creditor, must be unimpaired by the plan.

The total amount of the administrative claims in class one is uncertain. The debtor says the administrative claims cannot be paid in full if the court rejects the § 506(c) allocations it has requested. Some of those expenses probably will not qualify for § 506(c) treatment. According to the debtor, allowed priority claims (class two) total $178,732.48. However, the estate has only $171,806.85, excluding the amount of up to $35,000.00 the Crabtree estate has agreed to contribute,[16] to pay both class one and class two claims. As previously noted, the contribution of the Crabtree estate is conditioned upon allowance in full of claim no. 97 for reimbursement of legal fees. Full allowance is improbable. Hence, it appears the debtor cannot pay the priority claims in full.[17]

15. See note 5, *supra,* and accompanying text.

16. See note 14, *supra.*

17. In such an event, confirmation of the debtor's plan would also be precluded under the provisions of § 1129(a)(9) which provides in material part:

(a) The court shall confirm a plan only if all of the following requirements are met:

. . . . .

(9) Except to the extent that the holder of a particular claim has agreed to a different

treatment of such claim, the plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

. . . . .

(C) with respect to a claim of a kind specified in section 507(a)(6) of this title, the holder of such claim will receive on account of

## Phase III Acreage

The debtor and UVB disagree on the acreage in Phase III. The UVB deed of trust describes the property as 1,505 acres more or less. The debtor believes the tract covers only 1,400 acres. The parties agree the value of the property is $400.00 per acre. Hence, they have a $42,000.00 disagreement. The proof is inconclusive. This court does not intend to "guess" who is correct in this $42,000.00 disagreement. Absent an agreement by the parties a survey or other proof will be required.

## Other Objections

FDIC contends the plan does not comply with the applicable provisions of Chapter 11 and that the plan is not proposed in good faith. Although the court has determined the plan may not be confirmed, bad faith has not been established.

The debtor proposes to transfer $1,327,-045.08 of the sale proceeds, attributable to the golf course and club, to FDIC to be held in escrow pending a determination of the Chemical Bank appeal in the Sixth Circuit Court of Appeals. The debtor further proposes to substitute FDIC for itself as the appellee in the Chemical Bank appeal. If its claim is a secured claim Chemical Bank will be entitled to $558,587.73 from the golf course and club proceeds, reducing in like amount the amount FDIC will receive. The FDIC does not consent to take up the "laboring oar" before the Sixth Circuit and does not consent to be an escrow holder. The court is not aware of the vehicle through which the debtor can force FDIC to be substituted involuntarily as the appellee before the Sixth Circuit in the Chemical Bank appeal.

■ DuVoisin objects to the debtor's proposal to pay the FDIC appraisal expense while no provision is included in the plan to pay his expense of $4,241.16, incurred for the appraisal of the Glade Springs Utility Co. stock. At the confirma-tion hearing counsel for the debtor stated he did not know his client's position on treating the appraisal fee as an administrative expense, but he concluded that he personally believed it qualifies as an administrative expense. The court agrees.

## Conclusion

The "Amended Plan Of Reorganization Proposed By Glade Springs, Inc., Debtor In Possession," filed September 10, 1986, will not be confirmed. The plan does not meet the requirements of 11 U.S.C.A. § 1129(a)(7)(A)(ii) (West 1979) with respect to the claim filed by Thomas DuVoisin, Liquidating Trustee for SIBC. Further, based on the present record the court cannot determine whether the same requirement is satisfied with respect to the claims of FDIC and FSLIC. Further, the present record does not establish that West Knoxville Investment Company, Inc. loaned the debtor $2,622,400.00 pursuant to a future advance agreement. It is improbable that claim no. 97 filed by the Crabtree estate is allowable in full. The § 506(c) expenses should be prorated instead of deducted from the resort sale proceeds prior to distribution. Contrary to the debtor's representation, class two consisting of priority claims is impaired, and the class members have not agreed to accept less than the value of the allowed amount of their claims. 11 U.S.C.A. § 1129(a)(9) (West 1979).[18] Other problems are also noted in this Memorandum.

---

such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

11 U.S.C.A. § 1129(a)(9) (West 1979).

**18.** See note 17, *supra*.