**In re OLYMPIA HOLDING CORPORATION, a/k/a P–I–E Nationwide, Inc., et al., Debtors.**

**Bankruptcy Nos. 90–4195–BKC–3P7, 90–4223–BKC–3P7.**

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

May 20, 1991.

Mitchell W. Legler, Jacksonville, Fla., for Trustee.

Roberta A. Colton, Tampa, Fla., for LB Credit.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This case came on to be heard upon Trustee's Motion to Surcharge LB Credit Corporation (LB Credit) for expenses under Section 506(c). A hearing was held on March 16, 1991, and upon the evidence presented the Court makes the following Findings of Facts and Conclusions of Law:

### Findings of Facts

LB Credit, as the successor to Wells Fargo Leasing Corporation, loaned $5,324,400 to Transcon, Inc. (Transcon), secured by 1,084 trailers.

On or about April 20, 1990, Transcon sold the 1,084 trailers to OHA, Inc. (OHA), and OHA assumed the Transcon obligation to LB Credit as reflected in the Assumption Agreement.

Simultaneously with the sale from Transcon to OHA, debtor "leased" the trailers from OHA for payments in excess of OHA's acquiring costs.

On October 16, 1990, debtor filed its voluntary petition for reorganization under Chapter 11.

On December 13, 1990, debtor made a decision that it could not successfully reorganize and decided to immediately shut down its business operations.

Historically, the shutdown of a trucking firm has presented a grave risk of widespread destruction of rolling stock from vandalism and theft by employees who have lost their jobs. In order to minimize potential damages, debtor implemented a marshalling plan on December 15, 1990.

The marshalling plan was designed to preserve and protect debtor's rolling stock. Security personnel was hired for twenty-four hour security at the terminals, and all rolling stock was moved to specified consolidation centers. This enabled the debtor to locate each piece of rolling stock, thus providing the secured creditors with an easier method for recovery.

The evidence shows that between 25 percent and 30 percent of debtor's rolling stock would have been damaged or destroyed had debtor not instituted its marshalling activities.

On December 20, 1990, LB Credit filed a motion to lift the automatic stay in order to recover its trailers and on January 14, 1991, relief was granted. Despite the Order, the Trustee refused to release the trailers to LB Credit because the estate was concerned about a conflicting claim by OHA.

On February 2, 1991, after LB Credit posted a $500,000 bond, the Trustee released the trailers. From February 2,

1991, until February 22, 1991, LB Credit removed the trailers in which it had an interest from the premises of the estate. The gross value of trailers was approximately $1,000 per trailer recovered.

Removal of the trailers from the Hagerstown, Maryland, facility was rendered especially difficult due to the physical conditions of the parking lot. Consequently, LB Credit encountered additional expenses in recovering trailers from such location.

During the marshalling period, the estate incurred over seven million dollars in expenses some of which were attributable to the consolidation efforts.

### Conclusions of Law

Section 506(c) provides:

The Trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Section 506(c) was intended by Congress as a codification of the equitable principle that a lienholder may be charged with the reasonable costs and expenses incurred by the Trustee to preserve or dispose of the liened property to the extent that the creditor derives a benefit from such efforts. H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 357 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6313; S.Rep. No. 95–989, 95th Cong., Sess. 68 (1978), U.S.Code & Admin.News 1978, pp. 5787, 5854.

### A. LB Credit is the Holder of an Allowed Secured Claim

■ The definition of "an allowed secured claim" within the meaning of § 506(c) is determined by § 506(a), the first sentence of which reads as follows:

(a) An *allowed claim* of a creditor secured by a lien on property in which the estate has an interest ... is a *secured claim* to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. (emphasis added)

A "creditor" is defined in § 101(9)(a) as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." Thus, a creditor is an entity that has a pre-petition claim against the debtor.

A "claim" is defined in § 101(4):

(4) "claim" means—

(A) *right to payment*, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. (emphasis added)

A nonrecourse lien falls within the § 101(4) definition of a "claim." *Marshall v. Farm Credii Bank of St. Louis*, 108 B.R. 195, 197–98 (Bankr.C.D.Ill.1989). Section 102(2) states that a "claim against the debtor" includes a "claim against property of the debtor." The legislative history of § 102(2) indicates that the definition of a "claim against the debtor" is "intended to cover nonrecourse loan agreements where the creditor's only rights are against property of the debtor, and not against the debtor personally." House Report No. 95–595, 95th Cong., 1st Sess. 316 (1977), U.S. Code Cong. & Admin.News 1978, p. 6273.

Section 541(a)(1) provides that the debtor's estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." As the legislative history notes, the scope of the section is broad and is intended to "bring anything of value that the debtors have into the estate." H.R.Rep. No. 595, 95th Cong., 1st Sess. 176 (1977), U.S.Code Cong. & Admin.News 1978, p. 6136.

Even if debtor was only a lessee of the trailers, such rights to them would constitute property of the estate. Debtor was

not in default to OHA and had the right to retain possession of the trailers until the end of the term. Therefore, the trailers were property of the estate and debtor had taken steps to preserve them.

The trailers faced an imminent threat of mass destruction and the Trustee incurred substantial expenses to preserve them with the benefit flowing to secured parties.

Upon the facts of this case, it is not necessary to distinguish between "leased" equipment and "owned" equipment for the purpose of a § 506(c) surcharge.

The language of § 506(c) provides no basis for differentiating between liens on property owned outright by the debtor and liens on property in which the debtor holds a subordinate leasehold interest. Furthermore, the policy basis for surcharging dictates that no such differentiation be made:

> The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that *the general estate and unsecured creditors should not be required to bear the costs of protecting what is not theirs.* [T]he debtor's only interest in such security is to the surplus remaining after payment of the debt. The security, in so far as necessary to pay the debt, has been carved out of the debtor's estate before bankruptcy occurs.

*In re Codesco, Inc.,* 18 B.R. 225, 229 (Bankr.S.D.N.Y.1982) (emphasis added).

Certainly, LB Credit is the holder of an allowed secured claim against the estate. It would be inequitable to allow it now to deny that it is a creditor for purposes of avoiding a 506(c) surcharge.

### B. Method of Calculating Expenses

■ In order to charge a secured creditor with a § 506(c) surcharge, three elements must be shown: 1) the expenses were necessary, 2) the amounts spent were reasonable, and 3) the creditor benefitted from the expenditures. *Matter of Delta Towers, Ltd.,* 924 F.2d 74, 76 (5th Cir.1991). *See also In re Trim–X, Inc.,* 695 F.2d 296, 299 (7th Cir.1982).

■ Debtor's purpose in incurring the marshalling expenses was primarily to assist the secured creditors having liens on the rolling stock. The secured creditors have benefitted. With over 12,400 pieces of collateral and all virtually indistinguishable for purposes of assessing costs, § 506(c) does not require that the Trustee allocate specific costs on an individual basis. *See In re Nautica Sports Centre, Inc.,* 81 B.R. 144, 144–45 (Bankr.S.D.Fla. 1987); *In re Glade Springs, Inc.,* 77 B.R. 184, 196 (Bankr.E.D.Tenn.1987); *In re Central Foundry Co.,* 45 B.R. 395, 407–08 (Bankr.N.D.Ala.1984). Such an allocation would be impractical and expensive.

■ As for the general overhead expenses, absent the marshalling, debtor would have shut down altogether, terminated all employees, and abandoned all terminal facilities. Under the circumstances, overhead items such as employee salaries and rent and utilities at the consolidation centers attributable to the marshalling were properly included as part of the expenses to be surcharged against the trailers. *In re Jim Kelly Ford of Dundee, Ltd.,* 14 B.R. 812, 816–17 (N.D.Ill.1981).

However, the $3,178,000 of salary holdbacks claimed by the Trustee as a marshalling expense were not sufficiently related to the consolidation effort to qualify as a reasonable expense expended for the preservation of the trailers. Thus that amount will not be allowed as a surcharge against LB Credit.

■ In addition, the expenses incurred from January 14, 1991, through February 2, 1991, were not necessary, as they related to LB Credit, because LB Credit had obtained relief from the stay and was prevented by the Trustee from repossessing the trailers. The reasonable and necessary expenses that the Trustee incurred within the time frame applicable to LB Credit total $3,255,000.

■ LB Credit had a lien on 1,084 of the 12,394 total pieces of rolling stock marshalled by the Trustee. Having an interest in 8.75 percent of the stock, LB Credit could properly be assessed with 8.75 per-

cent of the expenses incurred preserving the collateral. Under that scenario, LB Credit's proportionate share would be $284,812.50.

However, under § 506(c) the Trustee may not impose a surcharge in excess of the amount of benefit derived by the secured creditor. The facts indicate that absent the marshalling effort the trailers would have decreased in value by 25 to 30 percent due to vandalism. Based upon the evidence presented, the Court concludes that each of the trailers had a value of $1,000. Consequently, had there been no marshalling the value of each trailer would have decreased by $250. Accordingly, LB Credit benefitted from the marshalling by at least $250 per trailer.

■ The Trustee is not required to show that the marshalling was for the sole and exclusive benefit of LB Credit in order to be entitled to a surcharge under § 506(c). Thus, the fact that others, including the debtor, may have received incidental benefits from the marshalling is of no legal consequence because LB Credit primarily and directly benefitted from the Trustee's efforts. Nor is the result changed by the fact that a third party will receive 80 percent of the amounts recovered by the Trustee from LB Credit. Nothing in § 506(c) disqualifies a surcharge depending on the ultimate recipient of the proceeds. The purpose of § 506(c) is to prevent a "windfall" to a creditor from efforts of the trustee in preserving property that belongs to the creditor and not the estate. *In re North Country Place, Ltd.*, 92 B.R. 437, 445 (Bankr.C.D.Cal.1988).

### C. Conclusion

Pursuant to 11 U.S.C. § 506(c) LB Credit shall pay the Trustee $250 for each trailer which LB Credit or its agents recover from any debtor consolidation center or parking facility (other than the Hagerstown, Maryland, parking facility), plus interest at the statutory rate from the date on which the Trustee filed the Motion to Surcharge.

LB Credit shall pay the Trustee $225 for each trailer which LB Credit Corporation or its agents recover from the Hagerstown, Maryland, parking facility, plus interest at the statutory rate from the date on which the Trustee filed the Motion to Surcharge.

A separate Order in favor of the Trustee will be entered.